**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| UNITED STATES LAND RESOURCES, LP, WATERFORD INVESTORS, LP and LAWRENCE S. BERGER | : : : : | |
| Plaintiffs, | : : | **OPINION** |
| v. | : : | Civil Action No. 08-5162 (WHW) |
| JDI REALTY LLC, JDI MONTCLAIR, LLC, JEFFEREY AEDER and WATERFORD INVESTORS LLC | : : : : | |
| Defendants. | : : : | |

**Walls, Senior District Judge**

Defendants have moved to dismiss plaintiffs' complaint pursuant to Fed. R. Civ. P. 12(b)(6).

**FACTUAL & PROCEDURAL BACKGROUND**

On August 21, 2008, plaintiffs United States Land Resources, LP ("USLR") and Waterford Investors, LP ("Waterford LP") filed a complaint in New Jersey Superior Court against defendants JDI Realty LLC, JDI Montclair LLC and Jeffrey Aeder. (See Not. of Removal Pls.' Compl. and Jury Demand ("Pls.' Compl.") (Dkt. Entry No. 1, filed Oct. 20, 2008.) Plaintiffs alleged the following:

NOT FOR PUBLICATION

Plaintiffs[1] entered into a contract to purchase a commercial warehouse in Wall Township, New Jersey (the "Property") for $15.6 million.  (See Pls.' Compl. ¶¶ 9-10.)  Plaintiffs obtained a mortgage from Smith Barney in the amount of $11 million and sought second mortgage financing from defendants.  (See id. ¶¶ 10-11.)  Defendant Jeffrey Aeder agreed on behalf of defendants to provide second mortgage financing in the amount of $3,150,000 at a rate of 17% per annum.  (See id. ¶ 12.)  As a condition, defendants required that plaintiffs enter into a partnership agreement with Aeder and transfer to defendants their partnership interest in the entity that contracted to purchase the property.[2]  (See id. ¶ 13.)  This structure was designed to allow defendants to effectively foreclose on the property without instituting a foreclosure proceeding.  (See id. ¶ 14.)  Aeder represented to plaintiffs that, "when plaintiffs paid off the second mortgage financing, defendants would be 'bought out' of any ownership interest in the property" and plaintiffs relied upon this representation in agreeing to the terms.  (See id. ¶ 16.)

Defendants originally agreed to provide the second mortgage financing for a three-year term, at the end of which (the "Unwind Date") defendants were to pay off the principal balance but plaintiffs "did not pay off the second mortgage financing [at the Unwind Date]," (Id. ¶ 18.), because Aeder had assured them on behalf of defendants that, as long as they continued to make

---

[1]Throughout their complaint, plaintiffs do not identify which of the named plaintiffs or named defendants specifically engaged in the alleged acts.  For purposes of the present motion, where the complaint is ambiguous the Court assumes that plaintiffs intend to plead that each and all of the plaintiffs engaged in the act.  However, in future pleadings plaintiffs must be more specific as to the actions and identities of each party.

[2]Plaintiffs plead ownership of the Property with a similar lack of precision to that which they apply to the parties.  The entity that purchased the Property is information plaintiffs should have little trouble specifying and plaintiffs must be more specific in their amended pleadings.

NOT FOR PUBLICATION

interest and principal payments, defendants "would honor their agreement to transfer back to [p]laintiffs their partnership interest in the entity owning the Property." (Id. ¶ 19.)

In 2003, without notice to plaintiffs, Aeder renegotiated a lease with one of the tenants at the Property at a lower rent. (See id. ¶¶ 20-21.) Plaintiffs claim that such reduction lowered the value of the Property. (See id. ¶ 22.) Defendants later sold the property, again without notice to plaintiffs, for "only $300,000 more than the price paid six years earlier." (See id. ¶ 23.) Plaintiffs first learned of the sale when they received a check for $64,117 from defendants, which sum, defendants asserted, was plaintiffs' share of the proceeds. (See id. ¶ 25.)

On the basis of these factual allegations, plaintiffs alleged fraud (Count 1), breach of contract (Count 2), unjust enrichment (Count 3), breach of implied duty of good faith and fair dealing (Count 4), conversion (Count 5) and breach of fiduciary duty (Count 6). (See Pls.' Compl. ¶¶ 27-50.) Defendants removed to this Court and filed a motion to dismiss in lieu of an answer. (See Mot. to Dismiss Action (Dkt. Entry No. 3, filed Dec. 14, 2008).) In response, plaintiffs filed an amended complaint, adding two new parties, plaintiff Lawrence Berger and defendant Waterford Investors, LLC ("Waterford LLC"), and making several changes to their initial allegations. (See First Am. Compl. (Dkt. Entry No. 4, filed December 31, 2008).) Plaintiffs allege that Waterford LLC "was created by defendants (or certain of them) to act as the general partner of Waterford LP." (Id. ¶ 10.) Waterford LLC has not been served. (See Defs.' Supp. 1.)

Plaintiffs now claim that Aeder, "acting both on his behalf and that of the [d]efendants (whom he controlled and was a principal in), agreed and promised plaintiffs that [d]efendants would not take any other action to jeopardize [p]laintiffs' interest in the [p]roperty as long as

**NOT FOR PUBLICATION**

[defendants][3] were paid the aforementioned seventeen percent (17%) interest," (See First Am.

Compl. ¶ 27.), and that "Aeder further assured the plaintiffs that neither he nor the other

[d]efendants were interested in ownership or operation of the property, and that they simply

wanted to collect 17% interest per annum as a lender." (See id. ¶ 29.) According to plaintiffs,

such assurances were given again after the transaction was consummated. (See id. ¶ 30.)

Plaintiffs insist that Aeder's assurances "were important and material to [p]laintiffs in agreeing

to proceed with the transaction as structured by [d]efendants, and in allowing the transaction to

continue without taking action to satisfy the loan or protect and preserve [p]laintiffs' rights and

interest." (See id. ¶ 31.) According to plaintiffs, "Aeder's assurances were untrue at the time

they were made and were given with the intention of inducing plaintiffs to rely" upon them in

"consummating the transaction and in refraining from taking actions which they would have

taken, or which [d]efendants believed they would have taken, to protect and preserve [p]laintiff's

rights." (See id. ¶ 32.) Additionally, [p]laintiffs allege that "there came a time when Aeder

knew that [his assurances] were no longer true, and Aeder knowingly and intentionally failed to

notify [p]laintiffs of that change, with the intention that [p]laintiffs would continue to rely." (See

id. ¶ 33.)

Plaintiffs also omit in their amended complaint, the allegation, present in their initial

complaint, that they "did not pay off the second mortgage in the year 2000," (See Pls.' Compl. ¶

18.), and delete dates that were present in the original complaint, (See, e.g., id. ¶ 17 ("The

---

[3]Plaintiffs' first amended complaint reads "as long as *Plaintiffs* were paid . . ." (First Am. Compl. ¶ 27 (emphasis added).) Because this allegation is inconsistent with all other allegations the Court assumes that the plaintiffs intended to say "as long as *defendants* were paid . . ."

NOT FOR PUBLICATION

original agreement . . . was that the second mortgage financing was for a period of three years . .

. plaintiffs were to pay off the second mortgage loan in or about the year 2000."); id. ¶ 20

(alleging that Aeder renegotiated the lease in 2003)), noting only that defendants received

payment of 17% per annum interest.  (See First Am. Compl. ¶ 34.)  Plaintiffs do provide more

detail as to the purportedly secret lease extension.  Now plaintiffs allege that Aeder and

defendants had agreed to the reduction in rent in order to extend the term of the lease and,

ultimately, to facilitate sale.  (Id. ¶ 35-42.)  Plaintiffs claim further that defendants "willfully and

knowingly [failed to] notif[y] [p]laintiffs in advance of [d]efendants' plan to renegotiate of [sic]

the lease or sell the Property because [d]efendants did not want [p]laintiffs"[4] to take action to

protect their interests.  (Id. ¶ 45.)  Finally, plaintiffs added a count for waste and mismanagement

(Count 7) and violation of the New Jersey Consumer Fraud Act (the "CFA") (Count 8).  (See

First Am. Compl. ¶¶ 51-57.)

        The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

Defendants now move for dismissal, with prejudice, of each of plaintiffs' counts.  Short of full

dismissal, defendants insist that plaintiff Waterford LP and plaintiff USLR should be dismissed,

that plaintiffs' fraud counts must be amended to plead fraud with particularity, that Waterford

LLC should be dismissed pending service of process and that plaintiffs' CFA claim must be

dismissed for failure to state a claim.

---

        [4]Plaintiffs' complaint read that defendants "willfully and knowingly notified plaintiffs in
advance of defendants' plan . . . "(First Am. Compl. ¶ 45.)  Read in the context of plaintiffs'
other allegations, which clearly allege that defendants failed to notify plaintiffs, this sentence can
only be understood to be a typographical error.  Defendants did not make any argument as to this
point at oral argument and, for purposes of this motion, the Court assumes that plaintiffs
intended the sentence to read "willfully and knowingly *failed to notify* plaintiffs."

NOT FOR PUBLICATION

**LEGAL STANDARD**

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court is required to accept as true all allegations in the complaint and draw all reasonable inferences in the light most favorable to the non-moving party.  See Umland v. Planco Fin. Servs., 542 F.3d 59, 64 (3d Cir. 2008); see also Phillips v. County of Allegheny, 515 F.3d 224, 232-33 (3d Cir. 2008).

A complaint will survive a motion under Rule 12(b)(6) if it states plausible grounds for plaintiff's entitlement to the relief sought.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 1965, 1968-69 (2007) (abrogating Conley v. Gibson, 355 U.S. 41, 45-46, 78 S. Ct. 99 (1957) which held that a "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief") (emphasis added).  A plaintiff's obligation to provide the grounds for its "entitlement to relief" requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atl. Corp., 127 S. Ct. at 1964-65.  In other words, the complaint must contain sufficient factual allegations "to raise a right to relief above the speculative level."  Id. at 1965.   "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."  Id. at 1981 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683 (1974)).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949, 2009 WL 1361536 (2009).

NOT FOR PUBLICATION

While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See id. at 1949-50. Moreover, the claimant must set forth sufficient information to outline the elements of his claims or to permit inferences to be drawn that these elements exist. See Fed. R. Civ. P. 8(a)(2); Twombly, 550 U.S. at 555.

The Court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record. See Sentinel Trust Co. v. Universal Bonding Ins. Co., 316 F.3d 213, 216 (3d Cir. 2003); see also 5B Wright & Miller, Federal Practice & Procedure § 1357 (2009). "A 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'" Mele v. Federal Reserve Bank, 359 F.3d 251, 255 n.5 (3d Cir. 2004) (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). "Plaintiffs cannot prevent a court from looking at the texts of the documents on which its claim is based by failing to attach or explicitly cite them." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).

**ANALYSIS**

1.    *Dismissal of Waterford LP*

On the basis of a good standing certificate from the State of New Jersey, defendants claim that Waterford LP was dissolved on September 30, 1997 and, therefore, it is legally impossible for Waterford LLC to have been its general partner during the operative years. (See Defs.' Supp. 8-9.) Moreover, defendants posit that plaintiffs fail to allege that Waterford LLC

NOT FOR PUBLICATION

authorized Waterford LP to hire plaintiffs' counsel, (See Def.'s Supp. 9.), and also fail to plead

that Waterford LLC authorized suit by Waterford LP against defendants (See id.)

      Plaintiffs respond that consideration of the certificate submitted by defendants is

improper on a Rule 12(b)(6) motion. (See Pls.' Opp'n 8-9.)  According to plaintiffs, the Court

should consider only the pleadings, documents attached to the pleadings, exhibits to the

pleadings and matters of judicial notice. (Pls.' Opp'n 8.)  Plaintiffs insist that whether Waterford

LP exists is a factual question more properly dealt with in discovery. (Pls.' Opp'n 9.)

      a.     **<u>Standard</u>**

      Generally, if "matters outside the pleadings are presented to and not excluded by the

court" a motion to dismiss must be treated as a motion for summary judgment.  Fed. R. Civ. P.

12(d); see also In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999);

Garlanger v. Verbeke, 223 F. Supp. 2d 596, 606 n.4 (D.N.J. 2002).  There are several narrow

exceptions to this general rule.  See In re Rockefeller Ctr. at 287.  A court may consider

documents "integral to or explicitly relied upon in the complaint," In re Burlington Coat Factory,

114 F.3d at 1426, or "undisputedly authentic documents [] if the plaintiff's claims are based on

the document." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d

Cir.1993).  The rationale behind these exceptions is that the primary problem created by review

of documents outside of the pleadings, a lack of notice to the plaintiff, is not present where a

plaintiff has actual notice of the document and relied upon it in its pleadings.  See In re

Burlington Coat Factory, 114 F.3d at 1426.

      b.     **<u>Discussion</u>**

NOT FOR PUBLICATION

This case is distinguishable from In re Burlington Coat Factory, where the Third Circuit affirmed a district court's consideration of an annual report because the complaint referred to data in the annual report without citation.  See id.  Although plaintiffs' claim here is not based on the document in question, defendants do rely on an "undisputedly authentic document."  See Pension Benefit Guar. Corp., 998 F.2d at 1196.  Plaintiffs do not contest the authenticity of the certificate and the certificate bears similarity to the other types of documents that courts have properly reviewed in support of a motion to dismiss.  See id. at 1197 (public records, including criminal case dispositions, letters of decision by government agencies, and published reports of administrative bodies, may be considered).  Unlike the documents deemed not to be public records for purposes of a motion to dismiss in Pension Benefit Guar. Corp., the certificate was not subject to any access restrictions.  See id. at 1197.

Based on the good standing certificate, Waterford LP was cancelled in 1997.  (See Certification of Robert E. Bartkus, Esq. (Dkt. Entry No. 7-2, filed Jan. 27, 2009).)  A non-existent plaintiff does not have standing to sue.  See Pharmaceutical Sales & Consulting Corp. v. J.W.S. Delavau Co., 59 F. Supp. 2d 398, 401 (D.N.J. 1999) (quoting St. John Baptist Greek Catholic Church v. Gengor, 118 N.J. Eq. 467, 473 (1935) (a "corporation must qualify as 'either de jure or de facto or it has no legal capacity to sue or be sued.'")  Waterford LP is dismissed without prejudice.  The Court grants plaintiffs leave to amend to plead the status of plaintiff Waterford LP.

2.      *Dismissal of USLR*

Defendants argue that defendant USLR should also be dismissed for lack of standing, (Def.'s Supp. 10 n.2.), and plaintiffs do not respond to this argument.  If the Court finds that USLR satisfies the requirements for standing generally, defendants argue that USLR lacks

NOT FOR PUBLICATION

standing for Count 6, alleging breach of fiduciary duty and Count 7, alleging waste, because

plaintiffs have conceded that Berger, as the partner in Waterford LP, is the only party asserting

these claims.  (See Pls.' Opp'n 23.)

     a.   **Standard**

"Article III of the Constitution restricts the judicial power of the United States to the

resolution of cases and controversies."  Taliaferro v. Darby Twp. Zoning Bd., 458 F.3d 181, 188

(3d Cir. 2006) (internal quotations omitted).  A litigant must satisfy the elements of standing or a

federal court does not have subject matter jurisdiction over the litigants claims and they must be

dismissed.  See id.

> The three elements of standing are
>
> "(1) the plaintiff must have suffered an injury in fact- an invasion of a legally protected
> interest which is (a) concrete and particularized, and (b) actual or imminent, not
> conjectural or hypothetical; (2) there must be a causal connection between the injury and
> the conduct complained of; and (3) it must be likely, as opposed to merely speculative,
> that the injury will be redressed by a favorable decision."

Id. (quoting United States v. Hays, 515 U.S. 737, 742-43, 115 S. Ct. 2431 (1995)).

     b.   **Discussion**

Plaintiffs pleadings as to USLR are opaque.  Although, plaintiffs assert that USLR

formed Waterford LP, (See First Am. Compl. ¶ 16.), and contributed $1,500,000 in cash to

permit Waterford LP to purchase the Property, (See First Am. Compl. ¶ 19.), plaintiffs then

resort to the general term "Plaintiffs" in other allegations.  The pleadings do not identify USLR,

separate from the other plaintiffs, as having independently been either the subject or object of the

other allegations.  This imprecision makes it difficult for the defendants, as well as the Court, to

disentangle the substance of plaintiffs' allegations.  However, accepting all of plaintiffs'

allegations as true and drawing all reasonable inferences in the light most favorable to the non-

**NOT FOR PUBLICATION**

moving party, see Umland, 542 F.3d at 64, plaintiffs' complaint alleges that USLR contributed

funds used to purchase the Property in reliance upon defendants' assurances that they would not

disturb plaintiffs' interests and, as a result, USLR suffered damages caused by defendants'

renegotiation of the lease and sale of the Property.

These allegations are sufficient to support USLR's standing with regard to plaintiffs'

claims for fraud (Count 1), breach of contract (Count 2), unjust enrichment (Count 3), breach of

implied duty of good faith and fair dealing (Count 4), conversion (Count 5) and the New Jersey

CFA (Count 8).  Plaintiffs have alleged that USLR was injured by reason of defendants'

misrepresentations and such injury could be redressed by judgment in USLR's favor.  Plaintiffs

do not, however, allege that USLR is an equity owner of Waterford LP, (See First Am. Compl. ¶

4.)  To the extent that any of plaintiffs' counts depend on a partnership relationship, such counts

must be dismissed as to USLR.  Count 6 alleges a breach of fiduciary duty owed by defendants

to plaintiffs "[b]y reason of the partnership relationship and business dealings between Plaintiffs

and Defendants." (See id. ¶ 48, p. 10.)  Plaintiffs conceded in opposition that this claim is "based

[on] a partnership relationship." (Pls.' Reply ¶ 23.)  As such, Count 6 is dismissed as to USLR.

For the same reasons as apply to Count 6, Count 7, which alleges that defendants "wasted the

only asset of Waterford LP to the detriment of [p]laintiffs," is dismissed as to USLR.

*3.     Fraud*

    a.     **Standard**

Rule 9(b) requires that "[i]n allegations of fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and

other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  "The

purpose of Rule 9(b) is to provide notice of the 'precise misconduct' with which defendants are

**NOT FOR PUBLICATION**

charged" in order to give them an opportunity to respond meaningfully to a complaint, "and to prevent false or unsubstantiated charges."  Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 658 (3d Cir. 1998).  To satisfy Rule 9(b), a plaintiff must "plead with particularity the 'circumstances' of the alleged fraud."  Rolo, 155 F.3d at 658.  Rule 9(b) "requires plaintiffs to plead 'the who, what, when, where, and how: the first paragraph of any newspaper story.'" In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999) (quoting DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990)).  Plaintiffs need not, however, plead the 'date, place or time' of the fraud, so long as they use an 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" Rolo, 155 F.3d at 658 (quoting Seville Indus. Machinery v. Southmost Machinery, 742 F.2d 786, 791 (3d Cir. 1984)).  The Third Circuit has cautioned that courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants." Rolo, 155 F. 3d at 658 (citing Christidis v. First Pennsylvania Mortgage Trust, 717 F.2d 96, 99 (3d Cir. 1983)).

The elements of fraud under New Jersey law are proof that the defendant made (1) a material misrepresentation of present or past fact; (2) with knowledge of its falsity; (3) with the intention that the other party rely thereon; and (4) which resulted in reasonable reliance by plaintiff. See Jewish Ctr. of Sussex County v. Whale, 86 N.J. 619, 432 A.2d 521, 524 (N.J. 1981). Defendants take issue with plaintiffs' pleadings as to all four of these prongs.

Defendants first argue that there is no allegation of a specific misrepresentation made by defendants at a specific time.  (Def.'s Supp. 12.)  According to defendants, plaintiff cannot assert fraud based on assertions made at the time of contract and, even if a fraud claim did survive, the statute of limitations would apply.  (Id. 12-13.)  Defendants add that plaintiffs' allegations that defendants may have later changed their mind fails because there is no "fraud in the

**NOT FOR PUBLICATION**

performance" of a contract.  Moreover, according to defendants, once plaintiffs defaulted, it was

not fraud for the defendants to refuse to perform.  (Id. 13.)

Defendants find further fault with plaintiffs failure to particularize aspects of the fraud

that they assert should be within Mr. Berger's knowledge.  According to defendants, plaintiffs

failed to disclose: (i) the initial period within which to unwind the transaction; (ii) when the

assurances took place; (iii) what form they took; and (iv) how long the forbearance was.  (Defs.'

Reply 6 (citing Pls.' Opp'n 2).)  According to defendants, the lack of particularity is an attempt

to avoid the implausibility of plaintiffs' claim that defendants agreed not to take action even if

plaintiffs failed to repay the principal, an implausibility that arises, according to defendants,

because the entire structure was set up to avoid the necessity of instituting a foreclosure

proceeding.  (See Defs.' Supp. 1.)

Defendants also claim that the pleadings are too generalized as to plaintiffs' reliance on

the purported representations.  (See Defs.' Supp. 13-14.)  Specifically, defendants insist that it is

not enough for plaintiffs to assert only that they failed to repay the loan in reliance on

defendants' assurances without also alleging that they could have repaid the loan.  (See id.)

Defendants entreat that the purposes of Rule 9(b) would be served by dismissal, not only because

plaintiffs have failed to place defendants on notice of the precise misconduct with which they are

charged but also because Rule 9(b) serves to safeguard defendants against spurious charges of

immoral or fraudulent behavior.  (See id. at 14.)

Plaintiffs resist these arguments by highlighting their allegations that defendant Aeder

and other defendants promised, both at the time of contract and in the years after the loan, that as

long as they received a 17% return they would not jeopardize plaintiffs' interest in the property

and, further, that if the principal was repaid they would return the partnership interest. According

**NOT FOR PUBLICATION**

to plaintiffs, specific dates and times are not required by Rule 9(b), and, in any event, plaintiffs identified the times that the misrepresentations occurred. (Pls.' Opp'n 10-11 (citing First Am. Compl. ¶¶ 27, 28, 29 & 30).) With regard to intent and knowledge, plaintiffs argue that allegations dealing with the state of mind or knowledge of the defendants may be generally averred and ask that the court be sensitive to the reality that facts necessary to prove this element are obviously within the defendant's control. (See Pls.' Opp'n 12.) But even with this consideration, plaintiffs assert their pleadings allow a reasonable inference, from the fact that defendants both renegotiated the lease and sold the Property without notice to plaintiffs, that defendants knew the alleged misrepresentations were false when made and intended that plaintiffs would rely on the truth of such assurances. (See id.) Additionally, even if such assurances may have been true at some point, plaintiffs allege that they had ceased to be true at a later point and defendants failed to correct plaintiffs mistaken impression. Plaintiffs reiterate that it is reasonable to infer from the secrecy of the transactions that defendants knew the representations were false. (See id. at 12-13.) In resistance to defendant's arguments as to reliance, plaintiffs assert anew that the representations were important to plaintiffs not only in initially entering the transaction but also in failing to take action to protect their interest later. (See id. at 13 (citing First Am. Compl. ¶ 31).)

  b.  **Discussion**

  Plaintiffs make two basic fraud claims: First, that Aeder and other defendants, which he allegedly controlled, at the time of contract misrepresented that as long as they received the 17% return defendants would not jeopardize plaintiffs' interest in the property and that if the principal was repaid Aeder would return the partnership interest and, second, that defendants made similar assertions at the unwind date. (See First Am. Compl. ¶ 27, 28, 29 & 30.)

NOT FOR PUBLICATION

Plaintiffs first claim fails under Rule 12(b)(6) because there is no fraud in the performance of a contract absent a showing that "at the time the promise to perform was made, the promisor did not intend to fulfill the promise." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1186 (3d Cir. 1993). Moreover, fraud can only be "extrinsic" to the contract terms. See Bracco Diagnostics, Inc. v. Bergen Brunswick Drug Co., 226 F.Supp. 2d 557, 564 (D.N.J. 2002). So, if the parties agreed at the original time of contract that defendants would not do anything to disturb plaintiffs' interest in the Property, any claim by plaintiff relating to such promise should be grounded in breach of contract not fraud. Plaintiffs fraud claim would have to allege that defendants made misrepresentations as to a matter distinct from the contractual agreement.

It is implausible not only that defendants would even make such an assurance, but also that plaintiffs could reasonably rely upon it. Plaintiffs allege that the parties structured the transaction to allow defendants to "foreclose" on the financing without the necessity of a formal foreclosure proceeding. (First Am. Compl. ¶ 25.) This conflicts with plaintiffs' allegation that defendants simultaneously represented that they would not exercise those rights in the event that plaintiffs failed to unwind the transaction.[5] Moreover, the structure of the transaction undermines plaintiffs' reasonable reliance on any such representation. How could plaintiffs believe that defendants would take no action if the parties had gone to such lengths to avoid a formal foreclosure proceeding? No amendment to the allegations can cure this incongruity.

Plaintiffs' second claim, however, might survive a motion to dismiss if plaintiffs provide increased specificity as to the identity of the parties and nature of the assurances. Unlike any

---

[5]As noted earlier, plaintiffs' initial complaint alleged "[t]he original agreement between the parties was that the second mortgage financing was for a period of three years. Thus, plaintiffs were to pay off the second mortgage loan in or about the year 2000." (Pls.' Compl. ¶ 17.) Plaintiffs removed this allegation from their First Amended Complaint but, as defendants note, this is a party admission. See Johnson v. Goldstein, 864 F. Supp. 490, 493 (E.D. Pa. 1994) (citing Federal Rule of Evidence 801(d)).

NOT FOR PUBLICATION

promises of forbearance made at the time of contract, it is plausible that defendants might have

assured plaintiffs at the unwind date that they did not need to pay off the principal balance of the

loan so long as they continued to make interest payments.  Specific dates and times are not

required by Rule 9(b), see Seville Indus. Machinery Corp. 742 F.2d at 791, and plaintiffs are not

required to plead the exact phrases that were used or the exact dates on which they occurred, so

long as they use an "alternative means of injecting precision and some measure of substantiation

into their allegations of fraud." Rolo, 155 F.3d at 658 (internal citations omitted).  Although

plaintiffs have failed to specify the exact dates that misrepresentations were made and the exact

form they took, plaintiffs have been precise about the nature of the misrepresentations and the

dates they occurred relative to other milestones in the transactions, (See First Am. Compl. ¶¶ 27-

30 (alleging that defendants promised not to act against plaintiffs' interest in the Property both at

the original time of contract, as well as at the Unwind Date).), and thereby injected sufficient

precision.  See Rolo, 155 F.3d at 658.

  With regard to intent, allegations that deal with the state of mind or knowledge of the

defendants may be generally averred.  See Fed. R. Civ. P. 9(b).  The court must be sensitive to

the reality that facts necessary to prove this element are obviously within the defendants' control.

See Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992).  As plaintiffs argue, the Court

can reasonably infer from the fact that defendants renegotiated the lease and sold the property, in

both cases without notice to plaintiffs, that defendants knew the representations were false.

(Pls.' Opp'n 12.)

  Whether plaintiffs have adequately pleaded reliance is a closer call.  Defendants argue

that it is not enough to say that plaintiffs simply did not repay the loan without saying they could

have repaid the loan.  (Def.'s Supp. 13-14.)  Plaintiffs respond only that the representations were

**NOT FOR PUBLICATION**

important to plaintiffs in entering the transactions.  (Pls.' Opp'n 13.) At the unwind date

plaintiffs' reliance was only that they did nothing to protect their interest.  Although plaintiffs do

not plead reliance in detail, it is reasonable to infer, based on plaintiffs' allegations that the fair

market value of the property exceeded the amount owed to defendants, that plaintiffs could have

taken action to protect their interests by selling the Property at this fair market value to a third

party and, in turn, paying off the second mortgage financing.

        In sum, plaintiffs' claims of fraud arising at the original time of contract are dismissed

with prejudice both because such claims are implausible and there can be no fraud in the

performance of a contract.  With regard to the Unwind Date, plaintiffs have satisfied Rule 9(b)

about alleged representations made by defendants then.  However plaintiffs have failed to be

sufficiently specific as to which defendants made these assurances.  Plaintiffs must plead the

"who" of "who, what, when, where and how" to satisfy Rule 9(b).  See In re Advanta Corp. Sec.

Lit., 180 F.3d at 534.  Plaintiffs' fraud claim based on alleged representations at the Unwind

Date is dismissed without prejudice with leave to amend.

*4.     Breach of Contract*

        Defendants argue that plaintiffs' allegations as to breach of contract are not sufficiently

"plausible," (See Defs.' Supp. 11.), both because plaintiffs defaulted on their obligation to

unwind the second mortgage agreement, (See Defs.' Supp. 12.), and because sophisticated

parties would not agree to such an open-ended commitment as plaintiffs allege without regard to

"business conditions, tenant's intentions and the like."  (Id.)

        Plaintiffs concede that they make two contract claims.  First, plaintiffs allege an

agreement by defendants not to harm plaintiffs' interest in the Property so long as defendants

were paid 17% interest, breached, first, when defendants secretly renegotiated the lease, with

NOT FOR PUBLICATION

damages due to the reduction in rental income and, second, when defendants sold the property at below market value without plaintiffs' knowledge, with damages equal to the loss of the Property as well as dissipation of its value.  (See Pls.' Opp'n 17-18.)  Second, plaintiffs claim, in their opposition brief but not in either complaint, that the transaction was an equitable mortgage, which defendants breached by failing to afford plaintiffs a right of redemption.  (See id. at 18.)

Defendants assail the alleged promise at the Unwind Date as just as implausible because defendants would not have agreed to forbearance of the mortgage loan without additional consideration, (See Defs.' Supp. 16.), fault plaintiffs for failing to allege what recourse defendants would have if plaintiffs defaulted and predict that, if an agreement to forbear was oral, it would be barred by the statute of frauds.  (See Defs.' Supp. 16.)  Defendants add that plaintiffs' assertion that defendants only valued the property up to the outstanding principal balance is illogical because defendants held a 99% interest in the entity which owned the Property.  Plaintiffs insist that this interest gave them an incentive to maximize the sale value of the Property.  Finally, defendants challenge plaintiffs' purported right to redemption, not only because the partnership agreement gave defendants the right to sell without a foreclosure action, (see id. ¶¶ 25-26.), but also because such claim was not pleaded.  In any event, defendants argue that New Jersey does not provide a right of foreclosure under these circumstances.  (See Defs.' Supp. 17.)

    a.    **Standard**

To state a claim for breach of contract, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  Frederico v. Home Depot, 507

NOT FOR PUBLICATION

F.3d 188, 203 (3d Cir. 2007) (citing Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc., 210 F. Supp. 2d 552, 561 (D.N.J. 2002)).

      b.     **Discussion**

The Court can glean three potential contracts arising from plaintiffs' pleadings: (1) the original second mortgage agreement; (2) the original second mortgage agreement as modified by the equitable mortgage law of New Jersey; and (3) an oral agreement under which plaintiffs agreed to continue to make interest payments and defendants agreed not to take any action to disturb plaintiffs' interests in the Property.  Although plaintiffs attempt to characterize the original second mortgage agreement as an agreement "not to take any action to deprive plaintiffs of the Property so long as [d]efendants were paid 17% interest," as discussed earlier, this agreement is implausible.

As to the second, although plaintiffs did plead breach of contract, they did not specifically plead the right of redemption.  However, under New Jersey law, plaintiffs have a colorable argument that the right of redemption was incorporated into the financing agreement. It is a long-standing rule of property that any agreement which cuts off or surrenders a mortgagor's right to redeem is void and unenforceable as against public policy.[6]  See Humble Oil & Refining Co. v. Doerr, 123 N.J. Super. 530, 544, 303 A.2d 898 (1973).  This rule applies not simply to traditional mortgage structures but to all transactions where the parties intend that real property be the security for the transaction.  See Rutherford National Bank v. H.R. Bogle & Co., 114 N.J. Eq. 571, 574, 169 A. 180 (Ch. 1933).

---

[6]Defendants' conclusion that Humble Oil would make the entire mortgage agreement null and void is incorrect.  If the equitable mortgage theory applies, any provisions of the agreement which clogged the right of redemption would be void but the entire contract would not.  See, e.g. Humble Oil, 123 N.J. Super. 530 (concluding that an option which clogged the right of redemption was invalid without disturbing the other terms of a sale leaseback transaction).

**NOT FOR PUBLICATION**

In any event, the Court need not address these issues unless and until plaintiffs file an amended complaint properly pleading these claims.  A court may grant a party leave to amend its pleadings pursuant to Rule 15(a)(1) and should freely give leave when justice so requires.  See Fed. R. Civ. P. 15(a)(1).  Given the early stage of this matter, it is appropriate to grant plaintiffs the opportunity to plead their equitable mortgage theory.

As to the third, plaintiffs have failed to state a claim.  Plaintiffs allege that, in return for plaintiffs' agreement to continue to make interest payments on the second mortgage loan, defendants agreed not to take any action adverse to plaintiffs' interest in the property, (See First Am. Compl. ¶ 27.), that despite receiving such interest, (See id. ¶ 34.), defendants renegotiated a lease on a portion of the Property and sold the property, (See id. ¶¶ 35-43.), that plaintiffs were thereby damaged because the new rent was lower and, consequently, the value of the property was diminished, (See id.  ¶ 41), and the Property sold for less than fair market value. (See id.  ¶ 43.)

In order for a contract to be valid,  it must be supported by adequate consideration.  See Restatement (Second) of Contracts § 17(1) (1981).  Consideration requires a bargained-for performance or return promise.  See id. § 71.  "[N]either the performance of duty nor the promise to render a performance already required by duty is a consideration for a return promise," because such promises are pre-existing duties.  2 Arthur L. Corbin, Corbin on Contracts § 7.1 (Joseph Perillo ed., Matthew Bender & Co. Inc. 2009).  Plaintiffs' pleadings are insufficient to resist a motion to dismiss because they fail to allege what consideration was provided for this purported agreement.

The Court of Chancery held in 1853 that consideration is lacking when a borrower promises to continue to pay interest on a mortgage loan for an unfixed period of time in

NOT FOR PUBLICATION

exchange for the lender's promise not to demand payment of the principal on its original due date.  See Massaker v. Mackerley, 9 N.J. Eq. 440, 444 (Ch. 1853).  The Massaker lender told the borrower "that he did not wish him to pay any more of the principal when . . . [it] became due; that all the . . . [lender] wanted was his interest."  Id.  When the lender later failed to give the borrower notice before demanding payment of the principal, the court found that the borrower's promise to continue to pay interest that he already owed "amount[ed] to nothing," and refused to enforce the agreement for forbearance of the principal payment for lack of consideration.  Id.

Other courts have found that somewhat similar transactions were supported by valid consideration.   "[A]n agreement between debtor and creditor, extending for a *fixed* time an interest-bearing debt, is a valid contract, in that the promise of a creditor to forbear collection and the surrender by the debtor of his right to stop accrual of interest by payment of the principal constitute sufficient consideration[] . . . " Burack v. Mayers, 187 A. 767, 769 (1936) (emphasis added); see also Massey v. Del-Valley Corp., 46 N.J. Super. 400, 134 A.2d 802, 805 (App. Div. 1957) (dictum) ("[T]he debtor's surrender of his technical right to pay off the principal of the debt and thus stop the accrual of interest thereon, gives rise to a good consideration."); 3 Williston on Contracts § 7.28 (Thomson Reuters/West 4th ed. 2009) ("When a debtor and a creditor agree that an interest bearing debt shall be extended for a fixed time, the promise of each is consideration for the promise of the other."); 29 Myron C. Weinstein, Law of Mortgages § 4.9 in N.J. Practice Series (Thomson Reuters/West 2d ed. 2008) (2001) (noting that the consideration requirement rarely causes difficulty in enforcing promise to extend time for payment).  Whether the term is finite is relevant because it indicates that the lender received a benefit.  That the lender's benefit is the primary question is suggested by a decision of the Court of Chancery in a similar situation, holding that a "[lender's] promise to extend a mortgage [to the

**NOT FOR PUBLICATION**

borrower in return for an agreement to take on an additional investor] rested upon a good consideration," and the contract was enforceable because as part of the extension the borrower had agreed to take on a new investor and the lender benefitted from additional security of its borrower's increased capitalization.  See Hauser v. Capital City Brewing Co., 57 A. 722, 724 (Ch. 1904).

The respective outcomes of Massaker and Burack hinge on whether the extension was for a fixed period of time in part because where the agreement is alleged to have been for a fixed period, the lender receives the benefit of the borrower's promise to pay interest for such fixed period.  This case is more similar to Massaker, where the borrower continued to pay interest for an unfixed period of time, than it is to Burack, where the alleged agreement was not open-ended.  In the present case, the plaintiffs have not alleged that the defendants' extension of interest payments was for a fixed period of time.  As in Massaker, the agreement was without consideration and the promise not to jeopardize plaintiffs' interest is unenforceable.  Moreover, unlike Hauser, defendants did not benefit from the purported promise.  See Hauser, 57 A. at 724.  Plaintiffs have failed to allege that the purported agreement made at the Unwind Date contract was supported by valid consideration and such claim must be dismissed.  Because the Court has concluded that plaintiffs' contract claim must be dismissed it need not address defendants' statute of frauds argument.  Plaintiffs' contract claims as alleged are dismissed without prejudice, with leave to amend its claim only to the extent that plaintiffs assert an equitable mortgage theory.

5.    *Unjust Enrichment*

According to defendants, plaintiffs unjust enrichment claim is speculative because they admit their default under the original agreement and do not allege that they gave anything to

NOT FOR PUBLICATION

defendants.  Defendants argue that, because no benefit was conveyed upon them, no unjust

enrichment claim can survive.  (Defs.' Supp. 20-21.)  An unjust enrichment plaintiff, defendants

reiterate, must allege that a defendant was enriched beyond its contractual rights.  (Id. at 21.)

Plaintiffs see such benefit in the $1.8 million in equity, allegedly contributed for

acquisition of the Property, that defendants allegedly retained after sale of the Property and

satisfaction of the outstanding principal balance.  (See Pls.' Opp'n 19.)

a.   **Standard**

"To establish unjust enrichment, a plaintiff must show both that defendant received a

benefit and that retention of that benefit without payment would be unjust."  Premier Pork L.L.C.

v. Westin, Inc., No. 07-1661, 2008 U.S. Dist. LEXIS 20532, at *40-41 (D.N.J. Mar. 17, 2008)

(internal citations omitted). "The unjust enrichment doctrine requires that plaintiff show that it

expected remuneration from the defendant at the time it performed or conferred a benefit on

defendant and that the failure of remuneration enriched defendant beyond its contractual rights."

VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554, 641 A.2d 519 (1994).

Consequently, liability for unjust enrichment is not appropriate where "an express

contract exists concerning the identical subject matter."  Premier Pork at *41.  "Although

litigants may plead alternative and inconsistent claims [], courts have on numerous occasions

dismissed under Rule 12(b)(6) unjust enrichment claims that relate to the same subject matter as

valid contracts."  Premier Pork, 2008 U.S. Dist. LEXIS 20532, at *42 (citing Estate of

Gleiberman v. Hartford Life Ins. Co., 94 Fed. Appx. 944, 947 (3d Cir. 2004); Royale Luau

Resort v. Kennedy Funding, Civil No. 07-1342, 2008 U.S. Dist. LEXIS 11902, at *30-31 (D.N.J.

Feb. 19, 2008); Kohn v. Haymount Ltd. P'ship, LP (In re Int'l Benefits Group, Inc., Civil No. 06-

2363, 2007 U.S. Dist. LEXIS 46889, at *11 (D.N.J. June 28, 2007); Oswell v. Morgan Stanley

**NOT FOR PUBLICATION**

Dean Witter & Co., Civil No. 06-5814, 2007 U.S. Dist. LEXIS 44315, at *29-30 (D.N.J. June 18, 2007)).

    b.   **Discussion**

Count 3 alleges that "[p]laintiffs have provided value to the [d]efendants," (First Am. Compl. ¶ 59.), "defendants have failed to pay plaintiff for the value received," (Id. ¶ 60.), and "retention of that value without payment for it would be unjust." (Id. ¶ 61.)

Because plaintiffs allege that a contract governed the arrangement, (Id. ¶¶ 22-28.), they cannot maintain an unjust enrichment claim. See Premier Pork at *42. As defendants aptly point out, the $1.8 million was paid in return for a 1% equity interest and, upon sale of the Property, the plaintiffs received 1% of the proceeds. So plaintiffs received remuneration for the benefits they conferred, in the form of equity in the partnership as well as their pro rata share of the proceeds from sale. If plaintiffs have a claim for the excess proceeds, that claim is properly grounded in contract. Count 3 is dismissed with prejudice.

6.    *Breach of Good Faith and Fair Dealing*

Defendants argue that plaintiffs claim for breach of good faith and fair dealing is speculative because plaintiffs have not alleged any "bad faith, or untoward commercial practices, or that [d]efendants undertook any actions 'without any legitimate purpose,' with the unlawful intent to deprive [p]laintiffs of the benefit of any bargain or contract." (Defs.' Supp. 21-22.) Plaintiffs rejoin that the duty of good faith and fair dealing requires that neither party do anything that would deprive either party of the benefit of their bargain. (See Pls.' Opp'n 21.) According to plaintiffs, they bargained for the forbearance and equity of redemption and defendants breached their duty by renegotiating the lease and selling the property. (See id.)

    a.   **Standard**

NOT FOR PUBLICATION

"A plaintiff may be entitled to relief under the covenant [of good faith and fair dealing] if its reasonable expectations are destroyed when a defendant acts with ill motives and without any legitimate purpose." DiCarlo v. St. Mary's Hospital, 2006 U.S. Dist. LEXIS 49000, *21 (D.N.J. July 19, 2006) (quoting Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs., 182 N.J. 210, 226, 864 A.2d 387 (2005)).  A "defendant may be liable for a breach of the covenant of good faith and fair dealing even if it does not violate an express term of a contract." Id.  For example, the covenant can be violated when a party to a contract withholds critical information from its contractual counterpart.  See Bak-A-Lum Corp. v. Alcoa Building Prods., 69 N.J. 123, 126-27, 129-30, 351 A.2d 349 (1976) (defendant's withholding of intention to terminate at will contract, while knowing that plaintiff was relying upon renewal of said contract could violate covenant).

      b.    **Discussion**

Even if plaintiffs had not pleaded that defendants had assured them they would not do anything to affect plaintiffs' interest in the Property, its other pleadings could color a violation of the covenant of good faith and fair dealing.  That plaintiffs did plead such assurances only further bolsters their claim.

To avoid dismissal plaintiffs need only set forth sufficient information to permit reasonable inferences that the elements of the cause of action exist.  See Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1357 (2d ed. 1990)).  Plaintiffs have alleged that they continued to make interest payments to defendants after the Unwind Date.  (See First Am. Compl ¶ 34.)  Based on plaintiffs' continued payments, it is reasonable to infer that defendants knew that plaintiffs did not anticipate the renegotiation of the lease or sale of the property and reasonable to infer, based

NOT FOR PUBLICATION

on the secret renegotiation and sale, that defendants proceeded without notice to plaintiffs for just that reason.  That these actions were done without notice, (See id. ¶¶ 38, 43.), also bolsters an inference that defendants acted with ill motive.

In Bak-A-Lum, a manufacturer withheld from its exclusive distributor its plan to terminate an exclusive distribution arrangement, despite the manufacturer's knowledge that the distributor was entering a lease in reliance on the continued exclusivity.  See Bak-A-Lum, 69 N.J. at 128.   The Bak-A-Lum court concluded that, although the manufacturer fulfilled its contractual obligations it breached the duty of good faith and fair dealing because it withheld critical information from its contractual counterpart.  See id. at 126-27, 129-30.  Here, as in Bak-A-Lum, plaintiffs have alleged that defendants, with knowledge of information critical to plaintiffs, acted against plaintiffs' interest.  Even if defendants complied with the terms of the contract, as the Bak-A-Lum defendants did, they could still be liable under the covenant of good faith and fair dealing.

Defendants' motion to dismiss with regard to plaintiffs' breach of good faith and fair dealing claim is denied.

*7.*     *Conversion*

Plaintiffs allege in Count 5 that "[d]efendants improperly and illegally converted property belonging to [p]laintiff," without disclosing what property plaintiffs are referring to.[7] (First Am. Compl. ¶ 44, p. 10.)

a.     **Standard**

_____

[7]Plaintiffs' First Am. Complaint contains two paragraphs numbered 44-57.  (See First Am. Compl. ¶¶ 43-57, pp. 7-9; 43-57, pp. 10-11.)  Where the Court refers to the latter set of paragraphs the citation includes the page number on which the paragraph appears.

NOT FOR PUBLICATION

The "[t]ort of conversion consists of the wrongful exercise of dominion and control over property owned by another in a manner inconsistent with the owner's rights." Commercial Ins. Co. of Newark v. Apgar, 111 N.J. Super. 108, 114-15, 267 A.2d 559 (Law Div. 1970) (citing McGlynn v. Schultz, 90 N.J. Super. 505 (Ch. Div. 1966), aff'd 95 N.J. Super. 412, 231 A.2d 386 (App. Div. 1967), cert. denied 50 N.J. 409, 235 A.2d 901 (1967).  Conversion requires that the defendant "assumed and exercised the right of ownership over [personal property] without permission."  Video Pipeline, Inc. v. Buena Vista, 275 F. Supp. 2d 543, 576 (D.N.J. 2003).

b.   **Discussion**

Defendants argue that the conversion claim should be dismissed because plaintiffs allege the parties agreed to transfer the partnership interests and have not alleged that defendants acted contrary to the terms of this agreement.  (Defs.' Reply 12.)  Although plaintiffs assert in reply that the conversion was of the interests in the partnership that owned the Property, (See Pls.' Opp'n 22.), plaintiffs do not allege that defendants violated the terms of this partnership agreement.  Plaintiffs allege only that defendants had promised not to exercise the rights associated with the partnership interests in such a way that would harm plaintiffs' interests in the property.  Because defendants consented to the transfer of the partnership interests defendants did not exercise a right of ownership over the partnership interests without permission and plaintiffs cannot maintain a conversion claim.  See Video Pipeline, 275 F. Supp. 2d at 576 (defendant must have assumed and exercised right of ownership without permission).  Count 5 is dismissed with prejudice.

8.   *Breach of Fiduciary Duty*

At Count 6 plaintiffs allege that defendants preferred their own interests over plaintiffs' and thereby "breached the fiduciary duty owed to [p]laintiffs, including but not limited to,

NOT FOR PUBLICATION

obligations of loyalty, good faith, fair dealing, full disclosure and care." (First Am. Compl. ¶ 49, p. 10.)

a.   **Standard**

"Each partner stands in a fiduciary relationship to every other partner." Heller v. Hartz Mountain Indus., 270 N.J. Super. 143, 150, 636 A.2d 599 (Law Div. 1993). "The relationship is one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits." Id. at 151 (internal citations omitted). "[W]here a managing partner controls the partnership's business, that partner is held to the strictest possible obligation to his or her co-partner." Id. (internal citations omitted).

b.   **Discussion**

"New Jersey does not find fiduciary duty in the debtor-creditor context," DiCarlo, supra, 2006 U.S. Dist. LEXIS 49000, at *26, so plaintiffs fiduciary duty claim depends upon the "partnership relationship." According to defendants, plaintiffs failed to allege the nature and name of the partnership the parties were in, the state in which the partnership was formed and whether there are general partners or limited partners, unless the partnership in question is Waterford LP, which plaintiffs assert was cancelled in 1997. According to plaintiffs, that the partnership in this case was unique does not mean the fiduciary duties are disregarded. (Pls.' Opp'n 24.) Defendants reply that, even if the Court were to accept plaintiffs' breach of fiduciary duty theory, defendants' damages are implausible because defendants stood to profit 99% of the value of the property and consequently had no incentive to devalue the Property, the sole partnership asset. (Defs.' Reply 12.)

Accepting the allegations as true and making all reasonable inferences that follow from such allegations, plaintiffs entered into a partnership with defendants by transferring 99% of the

NOT FOR PUBLICATION

equity in Waterford LP to defendants (See First Am. Compl. ¶ 24.)  Defendants then owed

plaintiffs a fiduciary duty not to prefer their own interests over those of plaintiffs.  Although the

pleadings are not a model of clarity, plaintiffs allegations, (See First Am. Compl. ¶ 48 (alleging

transfer of an interest in a partnership to defendants and a breach of fiduciary duty).), are

sufficient to put defendants on notice as to plaintiffs' claims, all that is required of plaintiffs to

defeat this motion.  See Fed. R. Civ. P. 8(a).

Defendants attach significance to plaintiffs' purported default but plaintiffs have alleged

that the defendants agreed to this forbearance.  (See First Am. Compl. ¶ 27.)  In any event,

whether plaintiff defaulted and, whether, upon such default, defendants could, consistent with

their fiduciary duty, renegotiate the underlying lease and sell the property in secret are questions

of fact, inappropriate to resolve at this stage. Defendants, in concluding that plaintiffs'

allegations are implausible in light of their 99% interest in the partnership, fail to observe that

the interests of a lender will often differ from those of a borrower.  It is easy to imagine that a

lender would be primarily concerned with ensuring that the outstanding principal balance was

covered, even where the lender and borrower have adopted a novel structure for the loan that

might allow the lender to profit from a higher sale price.  The lender may not be familiar with

the business of leasing commercial real estate but may be more comfortable with the business of

lending money. As a result, the lender might be primarily concerned with receiving the principal

owed on the loan earlier rather than a higher sale price later.  At the very least, it is not

implausible that defendants acted contrary to the interests of plaintiffs in selling at a price lower

than market value but greater than the amount then outstanding on the second mortgage loan.

Defendants' motion to dismiss Count 6 is denied.

*9.  Waste and Mismanagement*

NOT FOR PUBLICATION

Count 7 alleges that "[b]y virtue of defendants' renegotiation of the Lease before its expiration at a below-market rent, and subsequent sale to a third-party purchaser at a below-market price, the [d]efendants wasted the only asset of Waterford LP to the detriment of [p]laintiffs." (First Am. Compl. ¶ 52, p. 10.)

    a.    **Discussion**

Plaintiffs attempt to clarify their waste theory in their opposition brief by stating that "this transaction may be viewed as a partnership which was controlled solely by Defendants. In this context, Defendants . . . took self serving actions, modifying the lease so as to reduce the rent and selling the Property at less than its fair market value, which decimated the value of the partnership asset, the Property." (Pls.' Opp'n 24.) Plaintiffs did not, however, cite any law in support of its waste and mismanagement claim, leaving the Court to hypothesize as to what plaintiffs actually allege was wasted. Although it appears that plaintiffs claims waste and mismanagement of the assets of the partnership by defendants, the details remain unclear. Accordingly, Count 7 is dismissed with leave to amend. Plaintiffs amended pleading shall be specific as to which property is involved in its waste claim, which of the defendants caused the waste and which of the plaintiffs suffered damages therefrom.

*10.*    *CFA*

At Count 8 plaintiffs allege that the conduct of defendants constitutes "unconscionable commercial practices in connection with the sale of merchandise in violation of the [New Jersey Consumer Fraud Act.]" (First Am. Compl. ¶¶ 56, p. 11.)

    a.    **Standard**

The purpose of the New Jersey Consumer Fraud Act (the "CFA") is "to 'eliminat[e] sharp practices and dealings in the marketing of merchandise and real estate.'" <u>Lee v. First</u>

NOT FOR PUBLICATION

Union Nat'l Bank, 199 N.J. 251 (2009) (quoting Channel Cos. v. Britton, 167 N.J. Super. 417,

418, 400 A.2d 1221 (App. Div. 1979)).  The New Jersey Consumer Fraud Act ("CFA") prohibits

> [t]he act, use or employment by any person of any unconscionable commercial practice,
> deception, fraud, false pretense, false promise, misrepresentation, or the knowing,
> concealment, suppression, or omission of any material fact with intent that others rely
> upon such concealment, suppression or omission, in connection with the sale or
> advertisement of any merchandise or real estate . . .

N.J. Stat. Ann. § 56:8-2. A party who suffers an "ascertainable loss" from a violation of the CFA

may recover treble damages, costs and attorneys fees.  See id. § 56-8:19.  For purposes of the

CFA, "merchandise" is defined broadly to include "any objects, wares, goods, commodities,

services or anything offered, directly or indirectly to the public for sale."  Id.. § 56-8:1.  The term

"advertisement" includes

> the attempt directly or indirectly by publication, dissemination, solicitation, indorsement
> or circulation or in any other way to induce directly or indirectly any person to enter or
> not enter into any obligation or acquire any title or interest in any merchandise or to
> increase the consumption thereof or to make any loan.

Id.

Certain types of transactions are specifically excluded from CFA protection, including

the sale of equity interests, see Waterloov Gutter Protection Systems Co., Inc. v. Absolute Gutter

Protection, L.L.C., 64 F. Supp. 2d 398 (D.N.J. 1999), and the sale of securities and services

provided in connection with the sale of securities.  See Lee, 199 N.J. at 263; see also Stella v.

Dean Witter Reynolds, Inc., 241 N.J. Super. 55, 75, 574 A.2d 468, 478 (1990); Bramblewood

Investors, Ltd. v. C & G Assoc., 262 N.J. Super. 96, 109 n.6 (Law Div. 1992).

In order to advance its purposes the CFA is to be interpreted "liberally in favor of

consumers."  Lee, 199 N.J. at 257 (internal citations omitted).  However, the New Jersey

Supreme Court has acknowledged "a need to place reasonable limits upon the operation of the

CFA despite broad statutory language, so that its enforcement properly reflects legislative intent,

**NOT FOR PUBLICATION**

however ascertained." Id. at 263 (internal quotations omitted).  Courts in this District have observed that "[t]he entire thrust of the [CFA] is 'pointed to products and services sold to consumers in the popular sense.'" Bracco Diagnostics, 226 F. Supp. 2d at 561 (quoting Neveroski v. Blair, 141 N.J. Super. 365, 378, 358 A.2d 473, 480 (App. Div. 1976)); see also Arc Networks, Inc. v. Gold Phone Card Co., 333 N.J. Super. 587, 756 A.2d 636 (Sup.Ct.  2000) (quoting Marascio v. Campanella,  298 N.J. Super. 491, 499, 689 A.2d 852 (App. Div. 1997)).

A key inquiry is whether a CFA plaintiff diminished or destroyed the value of the good at issue.  As example, in Arc Networks, a telephone card retailer, Gold Phone, sued a telephone company, Arc Networks, which had agreed to provide telephone services to purchasers of Gold Phone's phone cards.  The Arc Networks court held that the telephone services that Gold Phone purchased from Arc were not available to the general public and that the transaction did not have the characteristics of a "consumer transaction."  Arc Networks, 756 A.2d at 637.  The Arc Networks court analogized the scenario to the facts of City Check Cashing, when a check cashing service brought suit under the CFA, claiming that when it borrowed funds from a bank it was in effect buying cash for resale to its check cashing customers.  See City Check Cashing, Inc. v. National State Bank, 244 N.J. Super. 304, 582 A.2d 809 (App. Div. 1990).  The City Check Cashing court reasoned that the check cashing service did not diminish or destroy the value of the cash and, therefore, the service was not a "consumer" for purposes of the CFA.  See City Check Cashing, 582 A.2d at 811. According to the Arc Networks court, Gold Phone similarly did not diminish the value of the phone services and, as a result, did not benefit from protection under the CFA.  See Arc Networks, 756 A.2d at 639.

      b.      **Discussion**

**NOT FOR PUBLICATION**

Defendants argue generally that plaintiffs, as sophisticated real estate investors should not be protected by the CFA.  Specifically, defendants insist that the CFA does not apply for three reasons: (i) transfers of partnership interests are considered sales of securities and outside the scope of the CFA; (ii) mortgages are not a sale of real estate under the CFA;[8] and (iii) plaintiffs are not "consumers" for purposes of the CFA.  Plaintiffs argue that this was not a sale of securities but an equitable mortgage, (See Pls.' Opp'n 26-27.), and that courts tend to hold that one cannot determine if there was an equitable mortgage in a summary fashion.  (See id. at 28 n.1.)  In an attempt to cast themselves as common consumers of credit, plaintiffs go so far as to cite Wikipedia[9] for analogy of the alleged agreement to those conducted by pawn shops. (Id. at 28.)  Finally, plaintiffs argue that even if it were a sale of securities it would still be covered by the CFA because the sale of securities was incidental.  (Id. at 29.)

As an initial matter, this transaction is not excluded from the protection of the CFA simply because the parties are sophisticated.  See Naporano Iron & Metal Co. v. American Crane Corp.,79 F. Supp. 2d 494, 509 (D.N.J. 1999).  Whether plaintiffs are consumers of credit turns not on their sophistication but on the nature of the transaction.  See Hundred East Credit Corp. v. Schuster Corp., 515 A.2d at 248.  Nor are plaintiffs excluded on the basis of analogy to the City Check Cashing plaintiffs, who lent money they purchased from the defendant bank to their customers.  See 582 A.2d 809.  In this case, plaintiffs used the proceeds of the second mortgage

---

[8]Defendants rely on Westervelt v. Gateway Financial Service, 190 N.J. Super. 615, 625, 464 A.2d 1203, 1208 (Ch. Div. 1983) for the proposition that a mortgage is not covered by the CFA.  Although plaintiffs argue that the statute the Westervelt court relied upon was repealed, such statute was merely revised and reenacted.  See N.J. Stat. Ann. § 17:11C-1 et seq.

[9]Plaintiffs do not provide a URL for their quotation from Wikipedia.  A search of Wikipedia for their quotation does return an entry with the provided quote. See Pawnbroker - Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/Pawnbroker.

NOT FOR PUBLICATION

financing to purchase the Property.  That they then lease space in the Property to their customers does not mean that they have not consumed the financing.

If the Court were to consider this a sale of real estate, as plaintiffs insist, the CFA would apply because it expressly covers sales of real estate.  See N.J. Stat. Ann. § 56:8-2.  However, a mortgage is not a "sale" of real estate for purposes of the CFA.  See Westervelt v. Gateway Financial Service, 190 N.J. Super. 615, 625, 464 A.2d 1203, 1208 (Ch. Div. 1983).  Moreover, plaintiffs do not plead that the transaction was a sale of real estate.  (See First Am. Compl. ¶ 56, p. 11 (alleging "unconscionable commercial practices in connection with the sale of merchandise") (emphasis added).) Because plaintiffs allege that the transaction was "an effort to create a mortgage on the Property," the transaction was not a sale of real estate. (Id. ¶ 26.)  If plaintiffs are to be protected by the CFA, something in the transaction must be "merchandise" for purposes of the CFA and only two items were transferred between plaintiffs and defendants: the partnership interests in the entity that purchased the Property transferred by plaintiffs to defendants, (Id. ¶ 24.), and the second mortgage financing provided by defendants to plaintiffs. (Id. ¶ 22-23.)

Defendants try to cast the transaction as a sale of partnership interests, relying on language from Westervelt.  If the Court were to view the transaction as a sale of partnership interests, the CFA would not apply.[10]  See Lee, 199 N.J. at 263.  The Westervelt plaintiffs had been forced to purchase term life insurance in connection with a second mortgage and later

---

[10]In their opposition brief, plaintiffs rely upon the Appellate Division's opinion in Lee v. First Union National Bank, 402 N.J. Super. 346, 954 A.2d 499, 2008 N.J. Super. LEXIS 187 (App. Div. 2008) for the proposition that "misrepresentations concerning the performance of financial services are covered by the CFA, even if the financial services relate to the purchase of a security."  (Pls.' Opp'n 29.)  The New Jersey Supreme Court recently reversed the Appellate Division and rejected this view, holding that the CFA does not govern the sale of securities, nor services related to the sale of securities.  See Lee., 199 N.J. at 263.

**NOT FOR PUBLICATION**

sought to void the agreement, alleging this so-called "loan packing" violated the CFA.  See
Westervelt, 464 A.2d at 1204-1205.  The Westervelt court concluded that the CFA did not apply
for several reasons.  First, the mortgage was more significantly a "security transaction" than a
conveyance of real estate.  Second, second mortgages were governed by a more specific statute,
the Secondary Loan Mortgage Act.  See id. at 1208; N.J. Stat. Ann. § 17:11A-34 et seq.
(repealed by N.J. Stat. Ann. § 17:11C-1 et seq.)  And, third, the respective remedies and means
of enforcement of the Secondary Loan Mortgage Act conflicted with the CFA.  See id.  For these
reasons the Westervelt court dismissed the CFA claims.[11]  See id. at 1208-1209.

Notwithstanding the Westervelt court's use of the phrase "security transaction," for
purposes of the CFA, the transfer of partnership interests as security for a loan does not convert a
transaction into a sale of securities, any more than the mortgage of property converts a
transaction into a sale of real estate.  See Westervelt, 190 N.J. Super. at 1208.  The second
mortgage financing was neither a sale of securities, clearly outside the protection of the CFA,
nor a sale of real estate, clearly covered by the CFA.

---

[11]Despite plaintiffs' assertions that the Secondary Mortgage Loan Act was repealed, the
statute was reworked as the New Jersey Licensed Lenders Act.  See N.J. Stat.§ 17:11C-1 et seq.
(2009). The statutory provisions of the reworked act conflict with the provisions of the CFA in
the same way that the provisions of the predecessor Secondary Mortgage Loan Act differed.
Thus, if the New Jersey Licensed Lenders Act applied to the transaction in this case and this
Court accepted the Westervelt court's reasoning, the CFA would not apply.  However, the New
Jersey Licensed Lenders Act applies only to "loans . . . secured in whole or in part by a lien upon
any interest in real property . . . subject to one or more prior mortgage liens and on which there is
erected a structure containing one, two, three, four, five or six dwelling units . . . "  N.J. Stat.§
17:11C-2 (2009).  The complaint contains no allegation that the Property contained dwelling
units.  Moreover, the loan in this case, which was secured by partnership interests in an entity
that owned a commercial property, can be distinguished from the loan at issue in Westervelt,
which was secured by the Westervelt plaintiffs' home.  See Westervelt, 464 A.2d at 1205.
Neither party has alerted the Court to a statute that governs the transaction at issue and thereby
could support analogous reasoning.  Absent such a showing, the Court concludes that the
Westervelt holding that the CFA does not apply to second mortgage is based on facts not
presented by plaintiffs' complaint.

**NOT FOR PUBLICATION**

The Court finds most apt plaintiffs' characterization of the transaction in their opposition "that they purchased . . . the use of money from defendants." (Pls.' Opp'n 30.) Consumer credit is clearly covered by the CFA. The New Jersey Supreme Court has concluded that the "[CFA] definition of 'merchandise' as 'anything offered, directly or indirectly to the public for sale' is more than sufficiently broad to include the sale of credit" and held that, by its terms, the CFA "appl[ies] to the offering, sale, or provision of consumer credit." Lemelledo v. Benefit Mgmt. Corp., 150 N.J. 255, 265, 696 A.2d 546 (1997) (internal citations omitted). The Lemelledo court did not expound as to the scope of "consumer credit." It is not clear that "consumer credit" means any and all forms of financing provided in all contexts.

There are three reasons the Court believes that the scope of credit transactions governed by the CFA must be limited to consumer credit "in the popular sense." See Bracco Diagnostics, 226 F. Supp. 2d at 561. First, as noted earlier, the New Jersey Supreme Court has acknowledged "a need to place reasonable limits upon the operation of the CFA despite broad statutory language, so that its enforcement properly reflects legislative intent, however ascertained." Lee, 199 N.J. at 263. In this vein, the Third Circuit concluded that "the entire thrust of the Consumer Fraud Act is pointed to products and services sold to consumers in the popular sense." J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1272 (3d Cir. 1994) (quoting Neveroski, 141 N.J. Super. at 378, 358 A.2d at 480). The Neveroski court provided additional context for this thrust in observing that

> Such consumers purchase products from retail sellers of merchandise consisting of personal property of all kinds or contract for services of various types brought to their attention by advertising or other sales techniques. The legislative language throughout the statute and the evils sought to be eliminated point to an intent to protect the consumer in the context of the ordinary meaning of that term in the market place

NOT FOR PUBLICATION

Neveroski, 141 N.J. Super. at 378, 358 A.2d at 480.  Although many forms of credit would fit this definition without significant contortions, more complex credit arrangements would not be so easily analogized.

Second, in several circumstances courts have found that the CFA did not apply to particular transactions even though other transactions involving those goods or services might fall under CFA protection.  See, e.g., City Check Cashing, Inc. v. National State Bank, 582 A.2d 809 (check cashing service was not a "consumer" of cash it borrowed from bank because it did not diminish the value of cash before passing it on to its customers); BOC Group, Inc. v. Lummus Crest, Inc., 251 N.J. Super. 271, 597 A.2d 1109 (Law Div. 1990) (purchaser of experimental petroleum refining concept was not a "consumer" of "merchandise"); J & R Ice Cream, 31 F.3d at 1273 (CFA is not applicable to sale of restaurant franchise); but see Kavky v. Herbalife Intern. of America, 359 N.J. Super. 497, 820 A.2d 677 (App. Div. 2003) (disagreeing with J & R Ice Cream to the extent it announced a blanket exclusion from the CFA of sales of businesses but approving of exclusion of franchise sales from CFA protection because such transactions were covered by a separate statute); A.H. Meyers & Co. v. CNA Ins. Co., 88 Fed. Appx. 495 (3d Cir. 2004) (concluding that agreement between insurer and insurance agent was indistinguishable from franchise agreement and, applying J & R Ice Cream, holding the CFA inapplicable); Bracco Diagnostics, 226 F. Supp. 2d at  561 (CFA is not applicable to accounting, inventory and chargeback processing services provided incidentally to wholesaling agreement that was not governed by the CFA).

Third, the Court is not convinced that the New Jersey Supreme Court would conclude that the CFA was applicable to this type of transaction.  The New Jersey Supreme Court did rule that, under certain circumstances "merchandise . . . appl[ies] to the offering, sale, or provision of

**NOT FOR PUBLICATION**

consumer credit." Lemelledo, 150 N.J. at 265 (internal citations omitted).  The Lemelledo court

pointed to the advertisement provisions of the CFA which include in the definition of

advertisement, "attempts . . . to induce directly or indirectly any person to . . . to make any loan."

Id. (citing N.J. Stat. Ann. § 56:8-1(a).  This conclusion was additionally grounded on the

reading, by a court in this District, of cases applying the consumer fraud statutes of other states

to provisions of credit. See id. (citing Tuxedo Beach Club Corp. v. City Federal Sav. Bank, 749

F.Supp. 635, 649 n.13 (D.N.J. 1990) (citing Le Sage v. Norwest Bank Calhoun-Isles, N.A., 409

N.W.2d 536 (Minn. Ct. App. 1987) (investment contract); Mid-America Nat'l Bank v. First Sav.

& Loan Ass'n, 515 N.E.2d 176 (Ill. App. Ct. 1987) (residential mortgages); Madsen v. Western

Am. Mortgage Co., 143 Ariz. 614, 694 P.2d 1228 (1985) (residential mortgages))). The Court

does not read Lemelledo to suggest that "consumer credit" includes all extensions of credit

because the types of credit involved in these cases were of the type typically offered to the

consumer and because, although the language of the CFA clearly establishes that the CFA

applies to certain types of credit, it does not establish that it applies to all provisions of credit.

Imposing CFA liability in this case would not serve the purposes of the CFA because the

second mortgage financing, where the parties engage in extensive negotiations unique to a

particular property and craft a novel financing structure involving the transfer of partnership

interests as security, does not reflect "the ordinary meaning of the consumer in the marketplace."

See J & R Ice Cream, 31 F.3d at 1273.  Similar to the franchise agreement in J & R Ice Cream

and the agency agreement in A.H. Meyers, the transaction in this case was not a consumer good

or service and was not covered by the CFA.  See id. at 1274; A.H. Meyers, 88 Fed. Appx. at 500.

Defendants' motion to dismiss Count 8 is granted. Count 8 is dismissed with prejudice.

**CONCLUSION**

**NOT FOR PUBLICATION**

In sum, defendants' motion to dismiss is granted in part and denied in part:  Defendants'
motion to dismiss with regard to Count 4 and Count 6 is denied.  Count 3, Count 5 and Count 8
are dismissed with prejudice as to all defendants.  Count 1, Count 2 and Count 7 are dismissed
without prejudice, with leave to file an amended pleading consistent with this Opinion.  With
respect only to plaintiff USLR, Counts 6 and 7 are dismissed with prejudice.  Plaintiff Waterford
LP is dismissed without prejudice, with leave to amend consistent with this Opinion.  Defendant
Waterford LLC is dismissed without prejudice, pending service of process.


**s/William H. Walls**
United States Senior District Judge

**Appearances**

William J. Pinilis
Pinilis Halpern
160 Morris Street
Morristown, NJ 07962
        Attorney for Plaintiffs

Robert E. Bartkus
Dillon, Bitar & Luther, LLC
53 Maple Avenue
PO Box 398
Morristown, NJ 07936-0398
        Attorney for Defendants